This is an appeal from a decree of the Circuit Court of Cole County, affirming an order of the Public Service Commission which requires the Kansas City Terminal Railway Company to construct and maintain at its sole expense a "viaduct and approaches thereto over and across its tracks, right of way and property" at the point where Oak Street in Kansas City, Missouri, if produced south, would cross.
The Terminal Company's railroad runs through Kansas City in a southwesterly and northeasterly direction from a point in the State of Kansas to the eastern city limits. At the point of the proposed crossing it has four main tracks used for the passage of trains to and from the Union Station, and also a freight yard which furnishes team-tracks facilities. These tracks occupy low ground through which a creek formerly ran as an open stream. Immediately south of the main tracks a bluff rises abruptly to an elevation of nearly forty feet; the team tracks spread out fanlike from the north side as far as Twentieth (an east-and-west) Street. The width of the strip of ground taken up for right of way proper and freight yard, lying between Twentieth Street and the bluff, is approximately 600 feet. This strip, owing to the contour of the ground and its occupancy by relator's railroad, can be crossed by a street only by means of a viaduct, and in order to obtain a suitable grade for a trafficway such viaduct must begin at or near Nineteenth Street, a block still further north.
In 1909 the Terminal Company, then recently organized by twelve trunk-line railroads entering Kansas City, set about to enlarge the plant, widen the right of way and change the grades of the old belt-line system which it had acquired from the Kansas City Belt Line Railway Company, and to build a union passenger station. Preliminarily *Page 367 
to entering upon its program of extensions and improvements it obtained from Kansas City a two-hundred-year franchise to operate its lines of railroad over and across public streets and public places of the city. The franchise ordinance required relator to construct viaducts at designated street crossings and to reconstruct others then in existence. The ordinance contained this further provision:
"Section 8. (a) If in addition to those specifically provided for elsewhere in this ordinance, viaducts or subways and approaches thereto or other rights such as appertain to the use of streets, are reasonably required in the future across any line of railroad now owned or which may be hereafter owned by the Kansas City Terminal Railway Company, at any time during the life of this franchise, the Kansas City Terminal Railway Company covenants and agrees to grant and does hereby grant and convey without expense to Kansas City rights of way therefore, and rights of way so granted shall be held by Kansas City as and for public streets.
"The Kansas City Terminal Railway Company further covenants and agrees that whenever any such viaduct or subway is reasonably necessary to provide for public traffic, and upon the passage of a reasonable ordinance by Kansas City fixing the time when the same shall be constructed and the place where the same shall be located, the Kansas City Terminal Railway Company will construct and thereafter maintain a subway and approaches (or a viaduct and approaches where a subway is impracticable); such construction and maintenance to be of like character and under like supervision with the construction and maintenance provided for the viaducts and subways mentioned in Sections 6 and 7 of this ordinance."
On December 12, 1921, an ordinance was duly enacted by Kansas City "to open, widen, alter and establish Locust Street from Gillham Road (near Twenty-fifth Street) to Twenty-seventh Street, condemning the necessary land therefor, providing for and authorizing *Page 368 
the construction of a viaduct with an approach thereto, in Oak Street, produced from the north, over the tracks, right of way and lands of the Kansas City Terminal Railway Company, condemning the necessary easement and right of way for said viaduct, providing for the cost of said improvement, and authorizing the issuing of condemnation fund certificates."
By way of preamble the ordinance recited:
"Whereas, owing to the rapid growth and development of Kansas City, the advent and increasing use of motor cars and trucks the north-and-south public traffic of the city has become badly congested, and is constantly increasing over the existing streets and viaducts crossing the tracks and right of way of the Kansas City Terminal Railway Company, leading to and from the business centers and the resident districts of the city; and
"Whereas, in order to provide for and relieve such constantly increasing congested traffic, it is necessary and it is the purpose of Kansas City, to construct a great north-and-south traffic way from the Armour-Swift-Burlington Bridge over the Missouri River, at the north side of the city, through the business sections thereof to the southern part of the city, over and along what is known as the Locust Street Connection (a public highway) connecting with Admiral Boulevard; thence south from Admiral Boulevard over and along Oak Street to 20th Street; thence south along Oak Street, produced from the north, over and across the tracks, right of way and land of the Kansas City Terminal Company to Gillham Road. . . . In order to reach the south side of the tracks, right of way and lands of the Kansas City Terminal Railway Company, it will be necessary to span such tracks, right of way and lands with a viaduct and an approach thereto, in Oak Street and Oak Street produced, from the south line of 19th Street to Gillham Road on the south; . . ."
The ordinance, after providing for the widening and altering of certain streets and the taking of the necessary lands therefor, required the Terminal Company to *Page 369 
"construct a viaduct and its approach to be used as and for a public highway in Oak Street and Oak Street produced south, over and across its tracks, right of way and lands and to the south line thereof, beginning in Oak Street at the south line of 19th Street, and extending south in Oak Street and Oak Street produced to the south line of its lands and right of way in Kansas City," all in accordance with the plans and specifications on file with the Board of Public Works of Kansas City. It also provided that an easement for the construction, support and maintenance of the viaduct and its approach, in all of the lands within the site of the proposed improvement, and in those immediately abutting thereon, be taken and condemned.
Relator having announced that it would not build a viaduct over and across its railroad and freight yard, as provided by the ordinance, Kansas City sought the aid of the Public Service Commission. The complaint filed by it with that body alleged that in 1909 Kansas City had enacted an ordinance, referred to as a "franchise ordinance," by which the Terminal Company was granted certain rights; that, by the terms of said ordinance, the Terminal Company was obliged to construct viaducts additional to those specifically mentioned in the ordinance and to grant rights of way therefor, when reasonably necessary for traffic, and upon the passage by the city of a reasonable ordinance so providing; that Kansas City had passed an ordinance (No. 41448) requiring the construction of a viaduct at Oak Street produced south across the tracks, right of way and lands of the Terminal Company in accordance with plans which were attached to and made a part of the ordinance; and that the Terminal Company had refused to construct the viaduct. The complaint then prayed: (1) That the Commission grant an order that the Terminal Company be required to permit Kansas City to extend Oak Street south from 20th Street over and across its tracks, right of way and lands as a right of way for a public street, upon and over which there should be *Page 370 
erected and maintained an overhead viaduct for public traffic, at the point, of the width, height, character and in the manner as in said ordinance No. 41448 designated and provided; and (2) that the Terminal Company be required to "comply with the said franchise obligation and with said ordinance No. 41448 passed in pursuance thereof, and to construct and maintain said viaduct and its approaches at its expense, as in said franchise and ordinance provided."
After a series of hearings the Commission ordered: (1) That Kansas City be granted permission to extend Oak Street over and across the right of way, tracks and property of the Terminal Company by means of a viaduct at the point set out in its Ordinance No. 41448; (2) that the Terminal Company construct a viaduct and approaches thereto over and across its tracks, right of way and property at Oak Street, extended, in accordance with a specified plan (a modification of the one prescribed by the ordinance), and at the point designated in the ordinance; (3) that the construction of the viaduct be started within thirty days after Kansas City shall have acquired the right to extend Oak Street across the right of way and tracks of the Terminal Company, and be completed within four months thereafter; and (4) that the total cost of the construction of such viaduct and the maintenance of the same be borne by the Terminal Company.
On the hearing the franchise ordinance of 1909, Ordinance No. 41448, together with the plans and specifications of the proposed viaduct therein referred to, and the testimony of experts as to the cost of construction, etc., were offered in evidence. In addition to this there was a great mass of testimony heard as to: (1) whether there was a public necessity for the extension of Oak Street across relator's right of way; (2) whether, if an additional traffic way across relator's tracks was reasonably required, a viaduct crossing which would fully meet the public's need could not be constructed at some place other than Oak Street where the cost of installation *Page 371 
would be much less; and (3) whether, by reason of the alleged interference of the viaduct structure with the facilities afforded by the relator's freight yard, its property was subject to condemnation for the proposed additional public use. Relator also offered evidence, which the Commission rejected, tending to show that the cost of constructing the viaduct, if imposed upon it, would be an undue burden upon interstate commerce.
When necessary the evidence will be referred to more in detail in connection with the questions considered.
Appellant assigns error under twenty-two heads, but its contentions with respect to the unreasonableness and unlawfulness of the Commission's order may be summarized as follows: (1) There is no reasonable public necessity for an additional viaduct over its tracks; (2) if an additional viaduct be needed it can be located at some place other than Oak Street, where it will interfere less with the operation of the railroad, where the cost of installation will be much less and where the public will be served equally as well; (3) if a viaduct be needed at Oak Street, its necessity is not caused by the presence or operation of the railroad or any of its facilities, but is caused solely by an obstacle of nature, consequently there is no basis for the imposition of its cost upon the railroad, and such imposition is therefore in violation of rights guaranteed under the Fourteenth Amendment of the Constitution of the United States; and (4) the cost of the construction and maintenance of the viaduct, imposed upon relator, constitutes an undue burden upon interstate commerce.
Appellant asserts that the errors of which it complains resulted largely from a fundamental misconception on the part of the Commission as to the nature and extent of its jurisdiction. It avers that the Commission completely abdicated the powers conferred upon it by the Public Service Commission laws and usurped the powers of a court of equity, in this, that it undertook to construe and enforce specifically an alleged contract between *Page 372 
the Terminal Company and the city, and in effect to issue a mandatory injunction against the Terminal Company to carry out the provisions of Ordinance No. 41448 (as modified by the modified plans submitted by the city engineer and the city counselor). The complaint upon which the proceeding was initiated and the character of much of the evidence received on the hearing tends to give countenance to the charge. But a complaint under the Public Service Commission Law is not to be tested by the technical rules of pleading; if it fairly presents for determination some matter which falls within the jurisdiction of the Commission, it is sufficient. On the question of jurisdiction in the instant case we are not so much concerned with the form and substance of the complaint as with the nature and extent of the order made and the considerations upon which it was based.
"The Commission is vested with such powers, and only such, as are conferred upon it by the Public Service Commission Law. By that law it is vested with the powers therein expressly conferred and all others necessary and proper to enable it to carry out fully and effectually all the purposes of the act." [Pub. Serv. Com. v. Railroad, 256 S.W. 226, 227.] The only power expressly conferred upon it with reference to the crossing of a railroad by a street is found in Section 50 of the Public Service Commission Act. [Laws 1913, p. 589; now Sec. 10459, R.S. 1919.] It is there provided that "the commission shall have the exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses, use and protection of each crossing of . . . a street by a railroad or vice versa. . . ." As applicable to the present controversy the Commission therefore had the power to determine and prescribe just three things: (1) the manner of crossing; (2) the terms of installation, operation and maintenance; and (3) the apportionment of expenses. In determining the "manner of crossing" the thing it was bound primarily to consider was the *Page 373 
public safety. Subordinate to this chief objective, considerations relating to economy of installation and the efficiency of the public service over each of the highways should have influenced its actions.
The Commission had the power to fix "the particular point ofcrossing," but only as an incident to determining the manner ofcrossing. Such is the significance of the express language of the statute. The only consideration that would have authorized it to change the particular point of crossing from that fixed by the ordinance in extending the street is that of the public safety. This because "questions relating to the necessity, expediency or propriety of establishing and extending streets and highways, even when they cross railroads, are not matters for its consideration. That power is lodged elsewhere." [Kirksville v. Hines, 285 Mo. 233, 240.] Under its charter powers Kansas City is authorized to determine for itself the necessity, expediency and propriety of exercising eminent domain in opening or extending its streets; it may locate and establish streets whenever and wherever it elects and take private property within their boundaries for the use thereof provided such use be in fact a public one. [Kirksville v. Hines, supra; Kansas City v. Railroad, 229 S.W. 771, 778.] It may be true, as appellant contends, that the ordinance extending Oak Street across its tracks is so arbitrary, oppressive and unreasonable that it is void; but whether it is or not is a judicial question which lay beyond the scope of the Commission's jurisdiction. And whether appellant's freight yards were subject to condemnation for street purposes and whether the cost of constructing the viaduct, if imposed upon appellant, would unduly burden interstate commerce were questions which for like reason the Commission was incompetent to consider or determine. These questions were therefore improperly injected into the proceeding had before the Commission. They were wholly irrelevant to any question which it was authorized to determine. In reviewing its order we therefore put them aside. When they are presented *Page 374 
in a proper judicial proceeding we will pass upon them, should such contingency ever arise.
Appellant makes no complaint of the manner, including theparticular point, of the crossing, as determined and prescribed by the order of the Commission. It does insist, however, that if a viaduct is to be constructed over and across its property at Oak Street, the cost of construction and maintenance cannot be lawfully imposed upon it.
"That railroad corporations may be required, at their own expense, not only to abolish existing grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways" is no longer an open question. [Erie Railroad Co. v. Pub. Util. Commrs., 254 U.S. 394, 409.] In this State, however, the Legislature has not seen fit to impose upon railroads by an inflexible rule the whole or any specific part of the expense incident to the separation of grades where their roads cross streets in such municipalities as Kansas City. Instead it has invested the Public Service Commission with the power "to determine and prescribe the . . . apportionment" of such expense. In the exercise of this power the Commission does not necessarily have to divide the expense in every instance
between the railroad and the municipality. "Apportionment" as used in the statute means the ascertainment of the amount which equitably the railroad, or the city, or each, in a given case should pay. [See 1 Bouv. Law Dict. (3 Rev.) Tit.,Apportionment.] We think there can be no question therefore but that the Commission can lawfully impose upon a railroad the entire cost of the construction and maintenance of a viaduct necessary to carry a street over and across its tracks where thefacts warrant such imposition.
It is obvious that the cost of a local improvement cannot be imposed upon a railroad merely because it is a railroad. The only basis under the police power for assessing against it the whole or any part of the cost of a *Page 375 
viaduct to carry a street across its tracks is that its presence at the locus in quo has made the viaduct necessary. If the contour of the ground is such that the railroad neither causes nor contributes to such necessity no part of the expense can be imposed upon it. On the other hand, even if the contour of the ground alone requires the construction of a viaduct in the projection of a highway, still if its cost is enhanced by the presence or operation of a railroad, the railroad to the extent of such enhancement may be required to bear the cost. [State ex rel. v. St. Paul Ry. Co., 62 Minn. 450; Ohio and Mississippi R.R. Co. v. Town of Bridgeport, 63 Ill. App. 224; C.B. Q.R.R. Co. v. Drainage Commrs., 200 U.S. 561.]
It seems to be conceded that even if there were no railroad tracks lying, as now, between the points of extension, an extension of Oak Street from Twentieth Street to Gillham Road, on the grades specified in Ordinance No. 41448, would require a viaduct similar in all respects to the one proposed. Or else a fill, an embankment of earth between retaining walls, of the same length and height would have to be constructed, the cost of which would equal or exceed that of a viaduct. There was evidence tending to show, however, and the Commission found, that the spread of the Terminal Company's team tracks at Oak Street made it necessary to build a viaduct of larger proportions than would otherwise have been required. We quote from the Commission's report:
"Under the natural conditions of the valley of O.K. Creek a bridge could have been constructed by the city with the approach thereto commencing at about Twentieth Street, with a fill for a great part of the distance where it is now necessary to construct concrete columns to enable the use of the right of way. In other words, if the railway were not present the bridge would be about one-half the length of what is now necessary for a viaduct. While in building such bridge it would be necessary to have a heavier grade than appears on the plan of the viaduct, yet the grade would not be so great as *Page 376 
to be impractical for the uses for which the traffic way is intended, and the easier grade on the viaduct is largely brought about by the fact of the width of the right of way and tracks now existing.
"It appearing that the Terminal Company's use of its right of way has enhanced the necessity, expediency and cost of the viaduct, the jurisdiction of the Commission attaches under the statute to apportion the cost. The jurisdiction to apportion having attached, it is the Commission's duty in making the apportionment to take into consideration all of the relevant evidence in the case affecting the equitableness of such apportionment.
"The most important single item of evidence affecting a just apportionment of the cost is the agreement on the part of the Terminal Company, as contained in Section 8 of the franchise, to construct and maintain all viaducts that are reasonably required by the public necessity and traffic conditions. When this agreement is considered in connection with the fact that the Terminal Company has contributed to the necessity and cost of this viaduct, and that the great weight of authority holds that the Legislature or city council, where power has been delegated to it, may assess all the cost of a separation of grades against the railroad, and that such was the law at the time the company entered into the contract with the city, there appears no valid reason, either in law or equity, why the Commission should relieve the Terminal Company of its obligation to construct and maintain this viaduct as it has agreed to do."
From the foregoing it is clear that the Commission but for the existence of the alleged franchise contract would not have apportioned to the Terminal Company all the cost of the viaduct but only the part thereof made necessary by the presence of its tracks.
As to the contract: Kansas City claims that the Terminal Company in accepting the provisions of the franchise ordinance of 1909, including Section 8 of the ordinance which has been set out, in full, covenanted to construct a viaduct "whenever any such viaduct . . . *Page 377 
is reasonably necessary to provide for public traffic, and upon the passage of a reasonable ordinance . . . fixing the time when the same shall be constructed and the place where the same shall be located;" that the contingencies upon which the covenant was based, the reasonable necessity of providing for public traffic and the passage of a reasonable ordinance have come to pass; and consequently, that the promise is now an unconditional present obligation. The Terminal Company on the other hand contends among other things: (1) that Section 8, the entire ordinance considered, was not intended as a contract, but merely as an express reservation of the city's police power; (2) that if a contract, it does not bind the Terminal Company to build viaducts over and across its freight yards, but only over its "line of railroad;" and (3) that the contingencies upon which the alleged promise was based have not happened, in this, that a viaduct at Oak Street is not "reasonably necessary to provide for public traffic," nor has "a reasonable ordinance" been passed. The issues thus tendered presented these questions: Did the passage of the franchise ordinance and its acceptance create, with respect to the provisions of Section 8, a contract between Kansas City and the Terminal Company? If so, should the words "line of railroad" be construed to include a freight yard? Have the antecedent conditions specified in the alleged contract been so fulfilled as to entitle the city to specific performance on the part of the Terminal Company? Such questions can be authoritatively determined only by a court, yet these occupied the attention of the Commission throughout the hearing to the exclusion of almost everything else. The Commission disavowed any purpose to construe or enforce a contract, but it is manifest, notwithstanding, that it not only heard and considered the contentions of the parties with respect to the alleged contract, but that it resolved them in favor of the city; otherwise, it would not have made the order it did. *Page 378 
The Commission has the exclusive power to determine and prescribe both (a) the manner of crossing and (b) the apportionment of expenses. But the exercise of this power with respect to one of these functions rests upon considerations which are without influence with reference to the other. A railroad and a municipality cannot by agreement determine the manner, including the particular point, of the crossing of the railroad by a street, because of the paramount interest of the public in the question of safety involved. But there is no reason why they may not agree upon the apportionment of the expenses. If either assumes the whole burden, or if they agree upon the proportionate part each shall pay, there is no occasion for submitting the question of apportionment to the Commission. In other words, the existence of a controversy as to the apportionment of expenses is a prerequisite to the exercise by the Commission of its jurisdiction with respect thereto. In the instant case there was a controversy, but one of which the Commission could not take cognizance. No apportionment of expenses in any proper sense was sought. The city was insisting upon the railroad paying all the expenses of construction and maintenance on the ground that it had bound itself by contract so to do. The Commission should therefore have determined and prescribed the manner, including the particular point, of crossings, and left questions pertaining to the construction and enforcement of the alleged contract for determination in a forum where the requisite jurisdiction existed.
For the reasons herein appearing the judgment of the circuit court is reversed and the order of the Public Service Commission affirmed therein is set aside.
All concur; except Atwood, J., not sitting.